## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:  Case No.  A06-00455-DMD | Chapter 7 |
| MARK J.  AVERY, | |
| Debtor. | Filed On 3/31/11 |
| WILLIAM M.  BARSTOW, TRUSTEE and SECURITY AVIATION, INC., an Alaska corporation, | Adversary No.  A08-90039-DMD |
| Plaintiffs, | |
| v. | |
| INGALDSON MAASEN & FITZGERALD, P.C., | |
| Defendant. | |

## SUMMARY JUDGMENT MEMORANDUM

This is an action for recovery of damages of $150,000.00 based upon a variety of state and federal law theories.  It is a core proceeding as to the plaintiffs' counts which allege violations of federal bankruptcy law.  The plaintiffs' state law claims are not core proceedings, but the defendant has consented to the bankruptcy court's jurisdiction to enter orders and judgments regarding such claims.[1]  Jurisdiction arises pursuant to 11 U.S.C. § 1334(b), the district court's order of reference and the consent of the parties.

---

[1] Def.'s Answer to Am. Compl., filed Dec. 3, 2008 (Docket No. 8), ¶ 2.

The plaintiffs' amended complaint alleges nine causes of action: (1) professional negligence; (2) breach of fiduciary duty; (3) unjust enrichment; (4) conversion; (5) actual fraudulent conveyance - § 548(a)(1)(A); (6) actual fraudulent conveyance - AS 34.40.010; (7) constructive fraudulent conveyance - § 548(a)(1)(B); (8) constructive fraudulent conveyance - § 548(a)(1)(B)(IV);[2] and (9) violation of automatic stay and avoidance of post-petition transfers - §§ 362 and 549.  The plaintiffs have filed a motion for summary judgment as to the following counts: (1) breach of fiduciary duty, (2) unjust enrichment, (3) conversion, (4) constructive fraudulent conveyance, and (5) illegal post-petition transfers.  I will grant partial summary judgment to the plaintiffs on their count for conversion and full summary judgment on their count for illegal post-petition transfers. The balance of the plaintiffs' motion will be denied.

The defendant has filed a cross-motion for partial summary judgment as to the plaintiffs' claim for unjust enrichment.  The defendant's cross-motion for partial summary judgment will be granted.  Further, this court will grant summary judgment to the defendant on the plaintiffs' second cause of action – breach of fiduciary duty.

---

[2]  This reference should probably be to § 548(a)(1)(B)(ii)(IV).

2

Background[3]

      Debtor Mark Avery is the son of the late Luther Avery, a prominent San Francisco trust attorney.  Luther was one of three named trustees for various trusts set up by Stanley Smith, a wealthy Australian mining magnate, and his wife, May Wong Smith. Stanley Smith died in 1968 but his wife continued to live long after his death.  The trusts the Smiths established had substantial assets.  The May and Stanley Smith Charitable Trust had assets of $350 million and the May Smith Trust had assets of $150 million.

      When Luther Avery died in 2001, Mark Avery ("Avery") succeeded to his position as trustee of the Smith trusts.  Avery, an attorney and former prosecutor, earned $600,000.00 a year as a trustee.  He was also entitled to bill the trusts for legal services. After becoming trustee, Avery bought an expensive home in Eagle River in 2004.  Around the time of this purchase, he met Robert Kane through Kane's mother, a real estate broker. With Kane's assistance, Avery moved May Smith from the Island of Guernsey, off the coast of France, to the Bahamas.  May Smith suffered from dementia and needed full-time care. Yet she remained a trustee of her trust along with Avery and two other trustees, John Collins and Dale Matheny.  All of the assets of the May Smith Trust were held by Avenco Ltd., a Bahamian Corporation.  Avery, Collins and Matheny were the sole shareholders of Avenco.

      After May Smith was relocated to the Bahamas, Avery, Collins and Matheny began to investigate options for providing reliable air transportation services for May Smith

---

[3] Some of the background facts in this memorandum are from this court's earlier Memorandum Regarding Substantive Consolidation, filed in the main case, *In re Avery*, Case No. A09-00455-DMD, on September 14, 2007 (Docket No. 136).

3

in case she needed to be moved from the Bahamas for medical treatment or other emergencies. In early May of 2005, Avery approached his co-trustees about a prospective business arrangement with Douglas Gilliland and his company, World Air, Inc. Under the proposal, Gilliland would use the assets of Avenco to secure a line of credit for the purchase of two to three long-range aircraft for use with a government contract. It was contemplated that the aircraft would also be available to provide any needed air transportation for May Smith.

On May 11, 2005, the trustees met in San Francisco and considered Avery's proposal. They agreed to make $50 million in trust assets available to use as collateral for the purchase of the aircraft. Avery was put in charge of making all the arrangements. Instead of utilizing the trust assets for the Gilliland venture, however, Avery used the assets for his own purposes. He opened a margin account in Avenco's name and immediately began taking massive draws on the account. On June 7, 2005, he directed $15 million from the margin account to an account belonging to one of his wholly owned businesses, Avery & Associates. From June 16 through October 5, 2005, he directed an additional $37.125 million from the margin account to an account belonging to Regional Protective Services, another entity he controlled.

Avery went on a wild spending spree with the trust money. He spent nearly $10 million to acquire Security Aviation, Medic Air, Premier Aviation and Medical Training Institute. These entities were all established businesses at the time of purchase. Avery purchased a wide variety of fixed and rotor-wing aircraft, including Czech L-39 fighters,

4

with over $28.2 million in disbursements from the Avery & Associates and Regional Protective Services accounts. Avery also purchased numerous costly personal assets, including a $500,000.00 mooseboat, a yacht, several vehicles, and motorhomes for himself and Kane.

Around the same time the Czech fighters were purchased, Security Aviation bought some rocket launchers to install on these aircraft. The FBI raided Security Aviation's offices and seized documents concerning the rocket launchers and the fighters. Federal criminal charges were filed against Robert Kane and Security Aviation for possession of unregistered destructive devices on February 22, 2006. Paul Stockler was retained as a criminal defense attorney for Kane. Wells Fargo pulled its line of credit for Security Aviation. Avery, after receiving $52 million from the May Smith Trust just months before, was broke. He had to liquidate aircraft to pay for the cost of defending against the criminal charges. Between April 17 and July 27, 2006, $8,442,351.05 of the proceeds from the sale of aircraft was transferred to Stockler's trust and e-trade accounts.

Security Aviation retained the law firm of Dorsey & Whitney to represent it in the criminal case. Dorsey & Whitney received a retainer of $400,000.00 from Avery's law firm, Avery and Associates, on February 2, 2006.[4] Kane retained Kevin Fitzgerald, an attorney in the firm of defendant Ingaldson, Maasen & Fitzgerald ("IMF"), to assist Stockler during the criminal trial.[5] Dorsey & Whitney transferred a portion of their retainer,

---

[4] Decl. of Russell Minkemann, filed Oct. 5, 2010 (Docket No. 25), ¶ 5.

[5] Decl. of Gary Spraker, filed Oct. 5, 2010 (Docket No. 26), Ex. C.

$50,000.00, to IMF for IMF's representation of Kane during the criminal trial.  The payment was made on February 24, 2006.[6]

Shortly after the criminal charges were brought against Kane and Security Aviation, the May Smith Trust retained the California firm of Townsend, Townsend & Crew to represent it in its efforts to obtain an accounting and recovery of the $52 million from Avery and Security Aviation.  On March 9, 2006, Maureen Sheehy, an attorney in this firm, wrote a letter to Security Aviation's counsel, Robert Bundy at Dorsey & Whitney,  to confirm recent phone conversations in which she had requested an accounting of trust assets from Avery and Security Aviation.[7]  Sheehy also advised that until such an accounting was made, none of the property purchased with funds from the trust was to be sold without the written consent of the trust.  The letter was sent via facsimile to Dorsey & Whitney the same day it was written.

Five days after Sheehy's letter was sent, on March 14, 2006, Security Aviation entered into an agreement for floor plan with Bell Aviation, Inc., for the sale of a S-550 Citation (N460-M).[8]  This agreement provided $1,450,000 to Security Aviation for interim financing.  These funds went to Stockler's trust account on March 22, 2006.[9]  IMF received

---

[6] *Id.*, Ex. B at 5.

[7] Spraker Decl. (Docket No. 26), Ex. E.

[8] Spraker Decl. (Docket No. 26), Ex. S (Kurtz Dep.).  The "Agreement for Floor Plan" between Security Aviation and Bell Aviation is the first attachment to this deposition excerpt.

[9] Stockler's receipt of this sum was established in a prior adversary proceeding.  *See Barstow v. Stockler*, Adv. No. A06-90059-DMD (Docket No. 13 - Mem. in Supp. of Mot. for Reconsid., Ex. 2).

$150,000.00 from Stockler's trust account on April 13, 2006.[10]  Avery testified at his § 341 meeting that proceeds from the sale of Security Aviation's aircraft were placed in Stockler's accounts in order to protect them, and that he believed the funds were being held in trust for Security Aviation.[11]

The criminal trial ran from May 15 to 26, 2006.  Fitzgerald and Stockler represented Kane at the trial, and Robert Bundy represented Security Aviation.  The jury acquitted Kane and Security Aviation of all charges.  At the conclusion of the trial, IMF applied a portion of its retainer against its fees and costs.  A balance of $100,302.92 remained in its trust account as of June 11, 2006.[12]

Two days before the jury entered its verdict, Louise Ma, another attorney with the California firm representing the May Smith Trust, wrote a letter to Robert Bundy regarding several issues.[13]  First, she advised that the trust had decided it would oversee the care of May Smith, in place of Regional Protective Services, another Avery entity.  Second, she noted that Avery had not yet responded to the firm's earlier requests for an accounting, and demanded repayment of the $52.125 million that Avery had received from the trust. Finally, she informed Bundy that Avery would no longer serve as counsel to the trust, and demanded return of any trust files in Avery's possession.

---

[10] Def.'s Answer to Am. Compl. (Docket No. 8), ¶ 29; Def.'s Opp'n to Mot. for Partial Summ. J., filed Nov. 15, 2010 (Docket No. 36), Ex. G.

[11] Spraker Decl. (Docket No. 26), Ex. D, 105:13 - 106:3, 223:24 - 224:4.

[12] Spraker Decl. (Docket No. 26), Ex. B.

[13] *Id.*, Ex. H.

7

Ma wrote a second letter to Bundy on June 9, 2006.[14]  In this letter, she stated, "As you know, [Avery] personally committed to repay [the $52 million] by March 31, 2006. To date, none of the principal has been paid and [Avery] has continued to refuse to address these issues."[15]  Bundy wrote to Ma on June 29, 2006, to inform her that Dorsey & Whitney would no longer be representing Avery or his associated companies.[16]  He indicated that Ma should direct all future correspondence to Fitzgerald.

On July 11, 2006, Fitzgerald wrote a letter to both Avery and Kane to confirm the understanding reached between them regarding his representation of Avery "in the present misunderstanding and/or dispute with the other trustees [of the May Smith Trust]."[17] Fitzgerald was to address the "problem of the deteriorating relationship between [Avery] and the other two trustees" of the May Smith Trust, an effort which he said "ultimately may serve in [Kane's] best interests" as well.[18]  The next day, July 12, 2006, Fitzgerald sent a letter to Louise Ma in which he advised that he represented "Avery and his associated companies in a limited manner with regard to matters involving the May Smith Trust."[19]  In the letter, Fitzgerald indicated that he was aware of the trust's request for an accounting, but questioned

---

[14] *Id.*, Ex. I.

[15] *Id.*, Ex. I at 1.

[16] Spraker Decl. (Docket No. 26), Ex. J.

[17] *Id.*, Ex. K.

[18] *Id.*

[19] *Id.*, Ex. L.

8

whether the trust documents imposed any obligation upon Avery to provide one.  He also indicated that Avery couldn't perform an accounting because his records had been seized by the federal government.  Fitzgerald suggested that a meeting be scheduled between the parties on August 11, 2006 to "discuss a variety of issues."[20]

Ma responded to Fitzgerald's letter on July 26, 2006.[21]  She confirmed that the May Smith Trust had made repeated requests of Avery for an accounting.  She clarified for Fitzgerald that Avery, in his capacity as a trustee, had a fiduciary duty to provide an accounting of trust assets, and noted that Avery was well aware of these duties, as he had advertised himself as an attorney with expertise in representing trust fiduciaries.  She reiterated that Avery was not to sell any property which he had purchased with trust assets, without the trust's written consent.  Ma declined to schedule a meeting because she felt it would not be productive until Avery had supplied an accounting of the trust monies.

On July 27, 2006, the May Smith Trust filed suit against Avery in the California Superior Court in San Francisco.[22]  Ma filed the verified petition on behalf of Collins and Matheny, the other two trustees of the May Smith Trust.  The petition sought to remove Avery as a trustee and recover the $52.125 million he had taken.  Avery was served with a copy of the complaint on July 28, 2006.[23]  Fitzgerald was personally served with the

---

[20] *Id.*

[21] Spraker Decl. (Docket No. 26), Ex. M.

[22] *Id.*, Ex. N.

[23] Aff. of Louise Ma, filed Dec. 8, 2010 (Docket No. 48), Ex. D.

9

complaint on the same date.[24]  The suit was filed just 16 days after Fitzgerald had informed Ma that he represented Avery.  In its answer, IMF admits that it was served with a copy of the California petition, but says that to the extent it was listed as Avery's counsel, this was done without its consent or authority.[25]  Ma states that IMF never informed her firm that it was no longer representing Avery.[26]

The California court entered an order granting the trustees' petition and requiring the surrender of all trust property on August 2, 2006.[27]  Avery and all companies he directly or indirectly controlled, including Security Aviation, were prohibited from making any kind of transfer of property that had been acquired from assets belonging to the May Smith Trust.  Copies of the August 2, 2006, order were sent to Avery's California counsel, Armon Cooper, and Kevin Fitzgerald in Alaska on August 3, 2006.[28]

The May Smith Trust took the deposition of Dave Kurtz, Security Aviation's chief mechanic, on August 16, 2006.  Paul Stockler appeared on behalf of Security Aviation at the deposition.  Kurtz testified that $7.7 million in proceeds from sales of Security Aviation aircraft had been deposited into accounts belonging to Stockler.[29]  $1,450,000.00

---

[24] Spraker Decl. (Docket No. 26), Ex. P; Aff. of Louise Ma (Docket No. 48), Ex. D.

[25] Def.'s Answer to Am. Compl. (Docket No. 8), ¶ 37.

[26] Aff. of Louise Ma, filed Dec. 8, 2010 (Docket No. 48),

[27] Aff. of Louise Ma (Docket No. 48), ¶ 10.

[28] Spraker Decl. (Docket No. 26), Ex. O; Aff. of Louise Ma (Docket No. 48), ¶ 13 and  Ex. G.  The order was sent via Federal Express overnight courier to Mr. Fitzgerald.

[29] Spraker Decl. (Docket No. 26), Ex. S.

from the sale of one aircraft, an S-550 Citation (N460-M), was placed into Stockler's trust account on March 22, 2006.  The proceeds from this sale funded the $150,000.00 retainer to IMF, as will be discussed in more detail below.

IMF was not a named defendant in the California litigation.  It ignored the order which the California Superior Court had issued.  IMF continued to apply its fees against the funds in its trust account from September of 2006 through March of 2007.[30] These fees were in excess of $43,000.00.[31]  IMF also paid Kane a total of $47,500.00 between September and December, 2006, from its trust account.[32]

Avery filed a chapter 7 petition on October 23, 2006.[33] William Barstow was appointed chapter 7 trustee and, on December 11, 2006, he obtained court authority to operate Security Aviation.[34]  Barstow also initiated an adversary proceeding against Stockler to recover funds that Avery or any of his entities had placed into Stockler's accounts.[35]  On December 22, 2006, Barstow obtained a preliminary injunction which prohibited Stockler

---

[30] *Id.*, Ex. B.

[31] *Id.*

[32] *Id.*

[33]  *In re Avery*, Case No. A06-00455-DMD, Docket No. 1 (Petition).  Nine entities associated with Avery were substantively consolidated with his bankruptcy individual case on September 14, 2007.  *Id.*, Docket No. 137 (Order Granting, in Part, and Denying, in Part, Trustee's Mot. for Substantive Consolidation). The consolidation was *nunc pro tunc*  to the date Avery's petition had been filed.

[34] *Id.*, Docket No. 66 (Order Granting Trustee's App. to Settle Preference Claims re: Security Aviation, Inc., and App. to Operate Business).

[35] *Barstow v. Stockler*, Adv. No. 06-90059-DMD.

11

from disposing of any funds received from Avery entities without court approval.[36]  The injunction also applied to Stockler's transfers of cash or property received from Robert Kane and any Kane entity.[37]  Cam Rader, an attorney with IMF, attended the preliminary injunction hearings on behalf of Kane.

After assuming management of Security Aviation, Barstow placed this entity in chapter 11 on December 21, 2006.[38]  He sold most of Security Aviation's assets to Stephen Kapper for $3.4 million on May 9, 2007.[39]  A liquidating plan of reorganization was confirmed on May 19, 2008.  Under Security Aviation's confirmed plan of liquidation, claims existing on the date of confirmation were transferred to the Avery bankruptcy estate.[40]

On March 5, 2007, the United States filed criminal charges against Mark Avery for five counts of wire fraud and ten counts of money laundering arising out of his transactions with the May Smith Trust.  Avery immediately pled guilty to the charges.  In his plea agreement, he stipulated that he had abused his position as trustee to acquire more than $52 million dollars "through an ambiguous arrangement which used the assets of the May

---

[36] *Id.*, Docket No. 10 (Prelim. Inj.).  Kane moved for reconsideration.  After a hearing, there were no material modifications of the original preliminary injunction.  *Id.*, Docket No. 19 (Order re: Mot. for Recons. and Mot. to Compel).

[37] *Id.*

[38] *In re Security Aviation, Inc.*, Case No. A06-00559-DMD, filed Dec. 21, 2006, Docket No. 1 (Petition).  IMF had $35,764.42 in its trust account at this time.  Spraker Decl. (Docket No. 26), Ex. B.

[39] *In re Security Aviation, Inc.*, Case No. A06-00559-DMD, Docket No. 115 (Revised Order Granting Mot. for Authority to Sell Assets Free and Clear of Liens and Assume and Assign Exec. Contracts).  A second revised order was entered on September 25, 2007 (Docket No. 198) solely for the purpose of attaching an exhibit which was omitted from the May 9th order.

[40] *Id.*, Docket No. 289 (Order Confirming Debtor's Plan of Liquidation).

Smith Trust as collateral," that he placed his personal financial interests above those of the trust, and that he used the trust's funds for his benefit and did not repay them.[41]  Avery also stipulated that he provided a fraudulent justification to acquire funds from the trust,[42] and that the assets and businesses he acquired with those funds benefitted him, personally, and not the trust.[43]  On April 19, 2008, District Court Judge Ralph Beistline sentenced Avery to 102 months in prison followed by 36 months of supervised release.[44]  Restitution of $52.125 million to the May Smith Trust was also imposed as a monetary penalty.[45]

Barstow initiated this adversary proceeding on October 22, 2008, in two capacities: as chapter 7 trustee of the Avery chapter 7 case and as successor in interest to Security Aviation, through the provisions of its confirmed chapter 11 plan.  His motion for summary judgment was filed on October 5, 2010.  IMF filed its motion for partial summary judgment on November 15, 2010.  After oral argument on the motions, held December 13, 2010, the court permitted limited additional briefing.  Both motions are now ripe for adjudication.

---

[41] Spraker Decl. (Docket No. 26), Ex. R at 9-10.

[42] *Id.*, Ex. R at 10.

[43] *Id.*, Ex. R at 12-13.

[44] *United States v. Avery*, Case No. 3:07-CR-00028-RRB, Docket No. 71.

[45] *Id.*

13

Summary Judgment

Fed. R. Civ. P. 56, which is applicable to adversary proceedings,[46] provides,

in part:

> **(a)  Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
>  . . . .
>
> **(c)  Procedures.**
>
> **(1)  *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)  citing to the particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party

---

[46] Fed. R. Bankr. P. 7056.

14

cannot produce admissible evidence to support the fact.

**(2)** *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

 . . . .

**(e)   Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show the movant is entitled to it; or

15

(4)  issue any other appropriate order.[47]

When considering a motion for summary judgment, all reasonable inferences supported by the evidence are drawn in favor of the party opposing a motion for summary judgment.[48]  But such inferences may be drawn "only if they are rational, reasonable and otherwise permissible in light of the governing substantive law and substantive evidentiary burden."[49]  A mere scintilla of evidence will not create a genuine issue of material fact.[50] "There must be evidence on which a jury could reasonably find for the plaintiff.[51]  Finally, conclusory affidavits do not establish an issue of fact for purposes of opposing a motion for summary judgment.[52] To defeat a motion for summary judgment, the non-moving party must establish the existence of material factual issues by producing evidence that would support a jury verdict in its favor.[53]

---

[47] Fed. R. Civ. P. 56 (effective Dec. 1, 2010)(emphasis in text).  Although the plaintiffs' and defendant's motions were filed prior to the effective date of amended Rule 56, under 28 U.S.C. § 2074(a) and the Order of the United States Supreme Court dated April 28, 2010, the amended rule applies to proceedings pending at the time the rule became effective, "insofar as just and practicable."  *See* Order of the Supreme Court of the United States, dated April 28, 2010, regarding amendments to the Federal Rules found at http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110.aspx.

[48] *Ballen v. City of Redmond,* 466 F.3d 736, 741 (9th Cir. 2006).

[49] *Bathony v. Transamerica Occidental Life Ins. Co.,* 795 F. Supp. 296, 298 (D. Alaska 1992).

[50] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

[51] *Id.*

[52] *Shane v. Greyhound Lines, Inc.*, 868 F.2d 1057, 1061 (9th Cir. 1989) (conclusory affidavits not backed up by statements of fact cannot defeat a motion for summary judgment); *see also* Fed. R. Civ. P. 56(c)(4).

[53] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

16

Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[54]  The Court may *sua sponte* enter summary judgment in favor of a non-moving party when the moving party has had a full and fair opportunity to ventilate the issues and under the facts it appears that the moving party could not prevail even if a trial were held.[55]

State Law

When interpreting state law, this Court is bound by the decisions of the state's highest court.[56]  In the absence of a decision by the highest state court, this Court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."[57]

---

[54] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[55] *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311-12 (9th Cir. 1982); Fed. R. Civ. P. 56(f).

[56] *West v. Amer. Tel. &Tel. Co.,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law.").

[57] *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001); *Paulman v. Gateway Ventures Partners III L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 578 (9th Cir. 1998).

17

<u>Source of the Retainers</u>

        In his summary judgment motion, the trustee seeks to recover both the $50,000.00 and $150,000.00 retainers that IMF received.  Both transfers were made indirectly to IMF.  It received an initial retainer of $50,000.00 from Dorsey & Whitney's trust account on February 24, 2006.[58]  The source of these funds was Avery and Associates, which had transferred $400,000.00 to Dorsey & Whitney on February 2, 2006 as a retainer for its representation of Security Aviation in the criminal trial.[59]  The trustee contends that payments from IMF's trust account to its operating account in March, April and May of 2006, which practically consumed the entirety of the initial $50,000.00 retainer, were transfers within the broad meaning of § 101(54).  In his pending motion, the trustee seeks to recover these funds under his constructive fraudulent conveyance count.

        I agree that the $50,000.00 retainer was an indirect transfer from Avery and Associates to IMF.  But the trustee never alleged that these funds were recoverable by the estate in the amended complaint.[60]  His fraudulent transfer counts are limited to the $150,000.00 retainer IMF received from Stockler's trust account.  His other counts request relief in a lesser sum, e.g., the $100,302.92 IMF held in its trust account as of June 11, 2006, or the $35,764.42 IMF held in its trust account as of the date Security Aviation filed its chapter 11 petition.  The amended complaint asserts no claim whatsoever as to the

---

[58] Spraker Decl. (Docket No. 26), Ex. B.

[59] Minkemann Decl. (Docket No. 25), ¶ 5.

[60] Am. Complaint, filed Oct. 23, 2008 (Docket No. 2).

18

$50,000.00 retainer.[61]  Summary judgment can only be made on a claim.[62]  Accordingly, the

court will make no determination on the $50,000.00 retainer here.

As to the second retainer received by IMF, the trustee's entire case rests upon

his assertion that the $150,000.00 retainer was the property of Security Aviation.  IMF

disputes this, arguing that the funds belonged instead to Kane.  IMF received $150,000.00

from Stockler's trust account on May 10, 2006.[63]  The trustee contends these funds were

proceeds from the sale of an S-550 Citation (N460-M) which belonged to Security Aviation.

He supports this contention with two pieces of evidence: an accounting that IMF prepared

in December of 2006 and the testimony and documentary evidence provided at the deposition

of Dave Kurtz, taken August 16, 2006.  The trustee says IMF's accounting shows that "the

only funds available to fund the $150,000 retainer were the $1,450,000 received from the sale

of the Citation."[64]  I agree with the trustee on this point.  IMF's accounting summarizes "the

Avery entity transactions with Paul Stockler."[65]  It reflects that a "Fedwire deposit" of

$1,450,000.00 was made to Stockler's trust account on March 22, 2006.[66]  The source of the

deposit is not identified.  The accounting also shows that a check from Stockler's trust

---

[61] *Id.*

[62] Fed. R. Civ. P. 56(a).

[63] Answer of Defendant IMF, paragraph 29, Docket No. 8.

[64] Pls.' Reply to Def.'s Opp'n to Mot. for Summ. J., filed Dec. 8, 2010 (Docket No. 43), at 7.

[65] Second Decl. of Spraker, filed Dec. 8, 2010 (Docket No. 44), Ex. DD at 2.

[66] *Id.*, Ex. DD at Ex. 2, p. 1.

19

account to IMF, in the sum of $150,000.00, was written on April 13, 2006.[67]  There are no intervening deposits between March 22, 2006, and April 13, 2006, when the $150,000.00 check to IMF was issued.  The trustee has established that the source of IMF's retainer was the $1.45 million Fedwire deposit into Stockler's trust account.

But how did the trustee match the $1.45 million deposit with the sale of the Citation?  Regional Protective Services, the Avery entity that received $37.125 million of the May Smith Trust's monies, paid $1,850,565.00 for this aircraft on August 9, 2005.[68]  The trustee alleges that it was placed in the name of Security Aviation.  Documents attached to the deposition of Dave Kurtz reflect one of the aircraft owned by Security Aviation was an S-550 Citation (N460-M).[69]  Security Aviation entered into an agreement for floor plan with Bell Aviation, Inc. on the Citation dated March 14, 2006.[70]  This agreement provided $1,450,000.00 to Security Aviation for interim financing.  Within days of entering into the floor plan agreement, Stockler's trust account was $1.45 million richer.[71]  As noted earlier, Kurtz had testified that $7.7 million in proceeds from sales of Security Aviation aircraft had been deposited into accounts belonging to Stockler.[72]

---

[67] *Id.*

[68] Second Decl. of Minkemann, filed Dec. 8, 2010 (Docket No. 45), ¶ 5.

[69] Spraker Decl. (Docket No. 26), Ex. S (Dep. of Dave Kurtz).

[70] *Id.*  The "Agreement for Floor Plan" is the first documentary exhibit included with the excerpts of the Kurtz deposition found at Ex. S.

[71] Second Decl. of Spraker, filed Dec. 8, 2010 (Docket No. 44), Ex. DD at Ex. 2, p. 1.

[72] Spraker Decl. (Docket No. 26), Ex. S.

Given the trustee's specific and meticulous documentation as to the source of the $150,000.00 retainer, IMF's responsive affidavits are entirely inadequate. Fitzgerald asserts that he "was informed by both Mr. Kane and Mr. Stockler that these monies were Mr. Kane's. This was consistent with Mr. Avery's later testimony as well as my own independent due diligence."[73] Fitzgerald doesn't describe the steps he took to perform his own "due diligence," and his assertions regarding Avery's later testimony are inaccurate.[74] His allegations as to statements made by Kane and Stockler are inadmissable hearsay under Rules 801 and 802 of the Fed. R. Evid. and Rule 56(c)(4) of the Fed. R. Civ. P. Further, Stockler's own testimony conflicts with Fitzgerald's statement as to Kane's ownership of the money. On January 4, 2007, Stockler testified that he didn't expect all the funds in his accounts were Kane's money,[75] that the money in his trust account was to fund the criminal trial,[76] and that he didn't know the source of the funds that were wired into his trust accounts, specifically, he didn't know "whether they were transferred from Avery & Associates, RPS,

---

[73] Aff. of Kevin Fitzgerald, filed Dec. 17, 2010 (Docket No. 52), at 2, ¶ 3.

[74] Avery never testified that the $150,000.00 retainer was property of Kane. He stated that the money belonged to Security Aviation, the Mary C. Avery Trust or LACO. *See* Second Spraker Decl. (Docket No. 44), Ex. Z at 64:3-7. He also testified that the money which was put into Stockler's account belonged to Security Aviation and was placed with Stockler to protect it. Spraker Decl. (Docket No. 26), Ex. D at 105:13 - 106:3.

[75] Second Decl. of Gary Spraker, filed Dec. 8, 2010 (Docket No. 44), Ex. AA at 36:3. Cam Rader attended the hearing in which Stockler provided this testimony, on behalf of Kane.

[76] *Id.*, Ex. AA at 36:25-37:1.

21

or Security Aviation."[77]  However, Stockler confirmed that 99% of all the money placed into

his accounts came from some "Avery entity."[78]

Fitzgerald's affidavit fails to address the evidence the trustee has presented as

to the true source of the funds.  Simply put, he does not have personal knowledge of the facts

surrounding the initial transfer of funds into Stockler's account.  He is not a competent

witness on this point.  His subjective and erroneous views as to the source of the retainer do

not create a genuine dispute as to this material issue of fact.

The affidavit of Cam Rader also fails to rebut the evidence the trustee has

presented.  Rader supplies a copy of minutes purportedly from a meeting of the trustees of

the May Smith Trust in which the trust authorized Avery to "employ a margin loan of up to

450,000" against certain trust investments "for purposes of acquiring and operating 'Security

Aviation.'"[79]  Further, Rader states that:

> in addition to the trustee's unanimous approval
> [that Avery purchase Security Aviation], we were
> informed by Mr. Kane, Mr. Avery and counsel
> such as Paul Stockler, that Mr. Kane was a
> legitimate employee of Security Aviation and that
> he was paid money for his services, and indeed,
> that he was owed compensation by the company.

---

[77] *Id.*, Ex. AA at 39:11-17.

[78] *Id.* at 39:20-24.

[79] Aff. of Stuart "Cam" Rader, filed Nov. 15, 2010 (Docket No. 37), Ex. 2.  The affidavit of Louise
Ma notes that Rader has never attended any trust meetings or spoken with the other trustees of the May Smith
Trust and his statements on this point lack any foundational support.  Ma Aff. (Docket No. 48), at 2, ¶ 4.
Further, as noted above, Avery admitted, in his plea agreement, that he had defrauded the trust and that any
businesses he acquired with trust money were for his own benefit, rather than the trust's.  Spraker Decl.
(Docket No. 26), Ex. R at 10.

> We had good reason to believe, in good faith, that the legal fees paid to IMF came from the lawful monies authorized to Security Aviation, and its employees, such as Mr. Kane.[80]

Rader's affidavit has the same failings as Fitzgerald's. Additionally, rather than supporting IMF's contention that the source of the retainer was Kane's property, his affidavit indicates that IMF may have known from the outset that its retainer came from "lawful monies authorized to Security Aviation." Further, even assuming Kane was owed money by Avery or Security Aviation, the purpose of the funds placed into Stockler's and then IMF's trust accounts was not for repayment of a debt, but to cover Kane's legal fees in the criminal trial.[81] The plaintiffs have thoroughly rebutted IMF's contentions to the contrary.[82]

Neither Fitzgerald's nor Rader's affidavit provides sufficient evidence to establish an issue of material fact as to the source of IMF's $150,000.00 retainer. Accordingly, based upon the trustee's evidence, and pursuant to Fed. R. Civ. P. 56(g), I find the following are material facts, not genuinely in dispute, which the court will treat as established in this case:

1)    The S-550 Citation (N460-M) belonged to Security Aviation;

---

[80] Rader Aff. (Docket No. 37), at 3, ¶ 4.

[81] Second Decl. of Gary Spraker, filed Dec. 8, 2010 (Docket No. 44), Ex. AA at 36:25-37:1.

[82] *See* Pls.' Reply to Def.'s Opp. to Mot. for Summ. J., filed Dec. 8, 2010 (Docket No. 43), at 5-13.

23

2)    The source of the $1.45 million wired to Stockler's trust account on March 22, 2006, was from the sale of the Citation;

3)    IMF's $150,000.00 retainer came out of the $1.45 million that had been wired to Stockler's trust account and was, therefore, attributable to the sale funds received for the Citation; and

4)    Security Aviation had an interest in the $1.45 million wired to Stockler and, consequently, IMF's $150,000.00 retainer.[83]

Nature of Client Trust Account

Another issue that must be determined before reaching the meat of the plaintiffs' motion is the nature of the $150,000.00 while it was held in IMF's trust account. Resolution of this issue requires an analysis of the rights in an attorney's client trust account under Alaska law, including the Alaska Rules of Professional Conduct. As does the Alaska Supreme Court,[84] this Court will also look to the Restatement (Third) of the Law Governing Lawyers for guidance.

---

[83] *Begier v. I.R.S.*, 496 U.S. 53, 58-59 (1990) ("property of the debtor" consists of "property that would have been part of the [bankruptcy estate] had it not been transferred before the commencement of bankruptcy proceedings.")

[84] *See, e.g., Weiner v. Burr, Pease & Kurtz, P.C.*, 221 P.3d 1, 8 (Alaska 2009); *Compton v. Kittleson*, 171 P.3d 172, 177 (Alaska 2007); *Pederson v. Barnes*, 139 P.3d 552, 557 (Alaska 2006).

24

"A lawyer shall deposit funds received for future fees and expenses into a client trust account, *to be withdrawn by the lawyer only as fees are earned or expenses are incurred.*"[85]  Subject to specified exceptions, an attorney must deliver to the client or, as in this case, the nonclient so entitled, all funds in the attorney's possession belonging to the client or nonclient.[86]  However, an attorney may retain the funds in his trust account if "there are substantial grounds for dispute as to the person entitled to the property," or "delivering the property to the client or nonclient would violate a court order or other legal obligation of the lawyer."[87]  Finally,

> [w]hen in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests.  If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.[88]

---

[85] Rule 1.15(c), Alaska R. Prof. Conduct (in effect in 2006) (emphasis added).  The current version of Rule 1.15(c) is identical.

[86] Restatement (Third) of Law Governing Lawyers § 45(1) ("Except as provided in Subsection (2), a lawyer must promptly deliver, to the client or nonclient so entitled, funds or other property in the lawyer's possession belonging to a client or nonclient.").

[87] Restatement (Third) of Law Governing Lawyers § 45(2)(d), (e).

[88] Rule 1.15 (c), Alaska R. Prof. Conduct (in effect in 2006).  This requirement is now found in Rule 1.15 (e), Alaska R. Prof. Conduct, but now clarifies that a lawyer must keep separate property in which "two or more persons (one of whom may be the lawyer), claim conflicting interests."  *See also* Restatement (Third) of Law Governing Lawyers § 44 cmt. g (if a lawyer is in possession of property of "a person claiming that property deposited with the lawyer by the client was taken or withheld unlawfully from that person," the lawyer must safeguard the contested property until the dispute is resolved.)

The initial purpose of the retainers paid to IMF were to fund Kane's defense in the criminal trial. Those funds were, however, subject to Security Aviation's right to request that the unearned portion of the funds be refunded.[89] By way of analogy, the transfer and deposit of funds into IMF's client trust account was similar to the deposit of funds with a bank in a demand account, albeit with a somewhat different method of withdrawal by Security Aviation. As in a bank demand account, the funds on deposit in IMF's client trust account remained the property of Security Aviation subject to disbursement at the direction of Security Aviation. Similarly, the right of IMF to withdraw the funds to pay its fees as earned and its expenses incurred in the defense of Kane is analogous to the right of a bank to debit a demand bank account for the agreed upon bank charges. Further, once IMF became aware that there was a dispute regarding who was entitled to receive the funds in its trust account, it was required to retain those funds until the dispute was resolved. These are the constraints under which IMF held the $150,000.00 in its trust account.

Breach of Fiduciary Duty

The trustee seeks summary judgment on the second cause of action stated in his amended complaint: breach of fiduciary duty. He argues that, once IMF agreed to represent Avery and his associated companies, the firm was in a sensitive position because it represented clients with conflicting claims: Avery and his companies on the one hand and

---

[89] *See* Rule 1.16(d), Alaska R. Prof. Conduct (in effect in 2006) ("Upon termination of representation, a lawyer shall . . . refund[] any advance payment of fee or expense that has not been earned or incurred."). The current version of Rule 1.16(d) contains essentially the same provision.

Kane on the other.  He says IMF knew or should have known, no later than August 16, 2006, that there were competing claims to the funds IMF held in its trust account.  He pins IMF's knowledge to this date because it is the date on which Security Aviation's chief mechanic was deposed.  Dave Kurtz's deposition was taken on the morning of August 15, 2006, in connection with the civil action the May Smith Trust had initiated against Avery.[90]  Kurtz testified that he wired funds from the sale of Security Aviation aircraft, including the Citation, into Stockler's trust account.  Stockler attended this deposition on behalf of Avery.[91]  IMF's itemized billing statements reflect that Fitzgerald had extended conferences with Stockler, Kane and Avery the same day to discuss a variety of matters, including the "civil lawsuit."[92]  IMF also billed for conferences with Kane and Avery on August 18, 2006, regarding "trust matters," and on August 23, 2006, IMF billed for a conference with Avery "regarding bankruptcy lawyers."[93]

In support of his motion on the breach of fiduciary count, the trustee cites *Willner's Fuel Distributors, Inc. v. Noreen.*[94]  In *Willner's*, Fairbanks attorney Robert Noreen represented Thomas Rosson individually as well as Rosson's solely owned corporation,

---

[90] Spraker Decl. (Docket No. 26), Ex. S.

[91] *Id.*

[92] Def.'s Opp'n to Mot. for Summ. J., filed Nov. 15, 2010 (Docket No. 36), Ex. O at 1.

[93] Spraker Decl. (Docket No. 26), Ex. B - IMF's Sept. 13, 2006 billing statement.

[94] 882 P.2d 399 (Alaska 1994).

27

Rosson, Inc. Noreen placed both in bankruptcy in 1986. Willner's Fuel Distributors, Inc., was listed as a creditor in both bankruptcy cases.

Both bankruptcy petitions were dismissed on April 9, 1988. One day earlier, Rosson and his corporation filed suit against the Fairbanks North Star Borough and other entities for breach of contract and negligence. The claim arose from a contract that had been awarded to Rosson, Inc. On May 9, 1988, Willner's filed suit against Rosson and Rosson, Inc., for $20,212.17. After learning that Rosson, Inc., had been involuntarily dissolved in 1985, it moved for default against the corporation. In March of 1989, Rosson's claim against the Fairbanks North Star Borough was settled for $100,000.00. According to Noreen, Rosson settled in his individual capacity and as past president or assignee of the dissolved corporation. The settlement checks were made payable jointly to Rosson and Noreen, only. They were deposited in Noreen's trust account on March 28, 1989. That same day, a default judgment was entered against Rosson, Inc., in Willner's civil action.

The timing of events thereafter was disputed. Noreen said he deposited the settlement funds in his trust account on the morning of March 28. He directed the bank to make a cashier's check for $80,000.00 payable to Rosson individually. He then wrote a check to himself for $20,000.00 and deposited it in his business account. These two transactions spent the entirety of the settlement proceeds. Noreen alleged that Willners served him with a levy against his trust account on the afternoon of March 28, after the settlement funds had been disbursed. He responded to the levy by advising that he had no funds belonging to Rosson, Inc., under his control. Willners sued Noreen and Rosson, and

28

alleged that Noreen had violated AS 09.40.040 for wrongfully disbursing funds of an insolvent, dissolved corporation.  Willners moved for summary judgment and Noreen filed a cross-motion, contending that he owed no fiduciary duty to Willners.

The lower court granted Noreen's motion, but the Alaska Supreme Court reversed and remanded the case, finding that there were disputed facts regarding the timing of the disbursals authorized by Noreen.  The court discussed the fiduciary responsibilities arising upon the dissolution and insolvency of a corporation.  It concluded that Rosson, in his capacity as director of a dissolved corporation, had a fiduciary responsibility to corporate creditors to preserve its assets for their benefit.[95]

The court also commented on the fiduciary responsibilities of Noreen.  It noted that Noreen represented clients with conflicting interests – Rosson, who wanted to maximize his individual claim in the settlement proceeds, and Rosson, Inc., which wanted to maximize its share of the proceeds so it could disburse these funds to its creditors – and that an attorney in such a situation might be liable for breach of his fiduciary responsibilities to either client.[96]  The court also found that Noreen had a fiduciary duty to the creditors of the dissolved corporation.  "Just as creditors may sue directors on behalf of a dissolved corporation, creditors may maintain similar actions against the attorney of the dissolved corporation for breach of the attorney's fiduciary duties."[97]

---

[95] *Id.* at 404-05.

[96] *Id.* at 405.

[97] *Id.*

29

> By way of summation, we hold that if an attorney represents both a dissolved or insolvent corporation and a director or officer of that firm, and if the attorney controls corporate assets, then the attorney must protect the financial rights of creditors to these assets, where he or she knows or should know that the director or officer intends to interfere with creditors' claims through an improper distribution of these assets. To do otherwise would sanction a class of wrongs without a remedy.[98]

The trustee argues that *Willner's* is applicable here and that he is entitled to the value of trust account funds held and disbursed by IMF following the Alaska criminal trial. I respectfully disagree. IMF did represent Avery "and his associated companies" for a limited period of time.[99] However, when IMF agreed to this representation, Fitzgerald advised both Avery and Kane that the two of them had a "potential conflict" and if an actual conflict did arise, IMF would represent Kane, not Avery.[100] In other words, the potential conflict was not between Avery and his corporate entity, Security Aviation, but between Avery and his related entities, on the one hand, and Kane, who purported to be a creditor of both.

IMF did control corporate assets, consisting of the $150,000.00 in Security Aviation proceeds placed in its trust account. IMF's disbursal of these funds after August 16,

---

[98] *Willner's Fuel Distrib.,* 882 P.2d at 406.

[99] Spraker Decl. (Docket No. 26), Ex. L (Fitzgerald's June 12, 2006, letter advising Ma that he represented "Avery and his associated companies in a limited manner with regard to matters involving the May Smith Trust.")

[100] Spraker Decl. (Docket No. 26), Ex. J.

30

2006, preferred IMF and Kane over the rights of the May Smith Trust, which was the largest creditor of both Avery and his related entity, Security Aviation.  Further, IMF knew about the May Smith Trust's claims against Avery; the very purpose of its limited representation of Avery was to assist him "in the present misunderstanding and/or dispute with the other trustees" of the May Smith Trust.[101]  After receipt of an injunction which prohibited Avery and his related entities from making any transfer of property acquired through the disposition of trust property, IMF continued to disburse funds from its trust account to itself and to Kane without regard to the rights of the May Smith Trust.

There are a number of similarities between *Willner's* and the case at bar.  However, the May Smith Trust is not a party to this adversary proceeding.  Barstow, as a chapter 7 trustee, has succeeded only to the rights of Avery, and his related entities, including Security Aviation.  I conclude that the trustee and Security Aviation lack standing to assert a claim for breach of fiduciary duty against IMF under the rationale stated in *Willner's*.  As the court made clear, the *creditor* of a dissolved corporation may maintain an action against the corporation's attorney for breach of fiduciary duty.[102]  The trustee simply does not stand in these shoes.  Further, the trustee cannot pursue this claim on behalf of the trust on the theory that it is an asset of either Avery's or Security Aviation's bankruptcy estate.  The May Smith Trust is a creditor in both bankruptcies.

---

[101] *Id.*

[102] *Willner's Fuel Distrib.,* 882 P.2d at 405 (emphasis added).

For these reasons, the trustee's motion for summary judgment on the issue of breach of fiduciary duty will be denied. Further, as noted above, the court may grant summary judgment *sua sponte* when, under the facts, it appears that the moving party could not prevail even if a trial were held.[103] Because the plaintiffs are not entitled to summary judgment on their second cause of action as a matter of law, IMF is entitled to summary judgment in its favor.

Conversion and Unlawful Post-Petition Transfer

The plaintiffs argue that IMF wrongfully converted funds remaining in its trust account after the conclusion of the criminal trial by paying Kane a total of $47,500.00 and paying its own legal bills for work it performed that was unrelated to the criminal trial.[104] The plaintiff's conversion count is the fourth cause of action in the amended complaint. It alleges damages in the sum of $92,810.31 under this theory.[105]

Conversion is a common law remedy governed by otherwise applicable state law. "The tort of conversion is 'an intentional exercise of dominion and control over a chattel which so seriously interferes with the right of another to control it that the actor may

---

[103] *Cool Fuel,* 685 F.2d at 311–12; Fed. R. Civ. P. 56(f).

[104] Pls.' Mot. for Summ. J., filed Oct. 5, 2010 (Docket No. 24), at 21-22.

[105] *See* Am. Complaint (Docket No. 2), at 15, ¶ 93. The plaintiffs' amended complaint contains a discrepancy regarding the amount remaining in IMF's trust account after the criminal trial. Their fourth cause of action states that this amount was $92,810.31, while ¶ 33 generally alleges that the balance after the trial concluded was $100,302.92. This discrepancy is not relevant to the court's analysis here.

32

justly be required to pay the other the full value of the chattel.'"[106]  As the Alaska Supreme

Court has noted:

> To establish a claim for conversion, the plaintiff must prove
> (1) that she had a possessory interest in the property; (2) that the
> defendant interfered with the plaintiff's right to possess the
> property; (3) that the defendant intended to interfere with
> plaintiff's possession; and (4) that the defendant's act was the
> legal cause of the plaintiff's loss of her property.[107]

Did Security Aviation have a possessory interest in IMF's trust account funds

as of June 11, 2006?  Many courts have adopted a view that a plaintiff must either be in

possession or entitled to immediate possession of the property in question at the time of the

wrongful act to maintain an action for conversion.  The Alaska Supreme Court has, however,

rejected that view, instead holding that a future possessory interest is sufficient to maintain

an action for conversion.[108]

As noted above, the funds held in IMF's client trust account were subject to

the right of Security Aviation to request the unearned portion of the funds be refunded.

Therefore, I find that Security Aviation had a sufficient future possessory interest in the

funds transferred to IMF that were deposited in the IMF client trust account to support an

action for conversion.

---

[106] *K & K Recycling, Inc. v. Alaska Gold, Inc.*, 80 P.3d 702, 717 (Alaska 2003) (quoting *Carver v. Quality Inspection & Testing, Inc.*, 946 P.2d 450, 456 (Alaska 1997)); *see also Dressel v. Weeks*, 779 P.2d 324, 328 (Alaska 1989)(conversion of specifically identified currency).

[107] *Silvers v. Silvers,* 999 P.2d 786, 793 (Alaska 2000) (footnote omitted); *see also K & K Recycling, Inc.,* 80 P.3d at 717 (citing *Silvers*).

[108] *McKibben v. Mohawk Oil Co., Ltd*., 667 P.2d 1223, 1228–29 (Alaska 1983), *overruled on other grounds by Wien Air Alaska v. Bubbel*, 723 P.2d 627 (Alaska 1986).

33

The second question is:  did the post-June 11, 2006, disbursements by IMF interfere with Security Aviation's future possessory interest?  To answer this question requires that the transfers be broken into two groups – transfers to Kane and transfers to IMF. Further, the transfers to IMF must be broken down further into transfers made in payment of its fees before and after Security Aviation filed its chapter 11 petition.

As noted above, the mere *retention* by IMF of the funds in its client trust account did not in any way interfere with Security Aviation's future possessory interest.  The transfers, however, present an entirely different picture.  Unless those transfers fell within one of the exceptions to the obligation of IMF to deliver the funds held in its trust account funds to Security Aviation upon its request, the transfers clearly interfered with Security Aviation's future possessory interest.  Here, the only exceptions that would be applicable would be transfers which were made with the consent of Security Aviation or transfers made to satisfy a valid attorney's lien.[109]  Under Alaska law, an attorney has a lien for compensation "upon money in the possession of the attorney belonging to the client."[110] Here, although the funds were subject to Security Aviation's future possessory interest, they were placed in IMF's trust account for the purpose of providing legal services to Kane. Additionally, IMF also represented Avery for a limited period before his bankruptcy petition was filed, and the retainer was applied against Avery's fees, as well. Thus, the transfer of funds from IMF's trust account did not interfere with Security Aviation's future possessory

---

[109] Restatement (Third) of Law Governing Lawyers § 45(2)(a), (c).

[110] AS § 34.35.430(a)(2).

34

interest in those funds to the extent that IMF had a valid attorney's lien for fees earned or expenses incurred representing Kane and/or Avery.  With respect to the prepetition transfers made to pay IMF's fees and expenses, I find that IMF  had a valid, existing attorney's lien for the fees it had earned or the expenses it had incurred.[111]  That lien extinguished Security Aviation's extant possessory interest and IMF was entitled to enforce its lien against the funds held in its client trust account for that purpose.

The post-petition transfers to IMF, however, present a different picture.  A review of IMF's fee itemizations from December, 2006, forward indicate that all its post-petition work was performed on behalf of Kane.[112]  After Security Aviation filed its chapter 11 petition, any attorney's lien IMF might assert for such services could not trump Security Aviation's possessory interest in the remainder of IMF's trust account.[113]  There are two reasons for this.  First, after Security Aviation filed bankruptcy, the balance of IMF's retainer become property of the bankruptcy estate.  Prior approval from the court must be obtained before a creditor may acquire a post-petition security interest in property of the estate to

---

[111]  It is uncontested that Security Aviation authorized the payment of IMF's fees from the $150,000.00.  The plaintiffs do not contend, nor have they shown, that IMF did not earn the fees or properly incurr the expenses for which IMF reimbursed itself from the client trust account.  However, while IMF's attorney's lien negates the plaintiffs' conversion claim, as to the pre-petition transfers, it does not affect the plaintiffs' fraudulent conveyance claims, which are based upon different legal principles.

[112] Def.'s Mot. for Partial Summ. J., filed Nov. 15, 2010 (Docket No. 35), Ex. O, 9-12.

[113] IMF does not contend the post-petition payments were authorized by Security Aviation as debtor in possession.  Consequently, Security Aviation is also entitled to recover the funds transferred from the IMF client trust account as unauthorized post-petition transfers.  11 U.S.C. §§ 549, 550.

35

secure obligations incurred by the debtor.[114]   Even if Security Aviation had consented to

IMF's post-petition representation of Kane, IMF could not assert a post-petition lien for such

services against the funds in its trust account because it did not obtain prior approval from

this court.   Nor did IMF seek court approval of its employment as counsel for Security

Aviation, which also required approval by this Court.[115]

Second, the filing of a petition in bankruptcy automatically stays "any act to

create, perfect, or enforce any lien against property of the estate."[116]   IMF did not obtain

relief from the automatic stay before making the post-petition transfers to itself.

Consequently, even if IMF might have otherwise held a lien, the post-petition transfers to

itself in payment of its fees constituted acts to enforce a lien against property of the estate.

Such acts violate the automatic stay and are void.[117]

The transfers to Kane present a different picture.   Absent prior authorization

or consent by Security Aviation, these transfers constituted conversion.[118]   IMF does not

contend that the $13,500.00 transferred post-petition was authorized by Security Aviation

---

[114] 11 U.S.C. § 364.

[115] 11 U.S.C. § 327.

[116] 11 U.S.C. § 362(a)(4).

[117] *Kalb v. Feurerstein*, 308 U.S. 433, 438–39 (1940); *Gruntz v. County of Los Angeles* (*In re Gruntz*), 202 F.3d 1074, 1082 (9th Cir. 2000) (en banc); *Schwartz v. United States* (*In re Schwartz*), 954 F.2d 569, 571 (9th Cir. 1992).

[118] Restatement (Second) of Torts § 228 ("One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated.").

36

as the debtor in possession.  With respect to the $34,000.00 transferred to Kane pre-petition, IMF has proffered no evidence that Security Aviation authorized the transfer to Kane.[119] And, as noted above, there is no evidence that these funds belonged to Kane.  There being no triable issue of fact, the entire $47,500 transferred by IMF to Kane constituted conversion, for which IMF is liable, as a matter of law.

The third question goes to the intent of IMF in making the transfers.  Under Alaska law, an "intentional act" is defined to encompass either an intent to interfere with property or an act done with knowledge on the part of the defendant "that the act or omission would result in such interference."[120]  Furthermore, an act may be intentional even if the defendant mistakenly believed that he or she had a right to interfere with the property, or was unaware of the rights of the plaintiff in the property.[121]  In this case, the evidence supports but one logical, reasonable inference:  IMF intended to deprive Security Aviation of the monies it held in its trust account.  That the fourth element, that the conversion by IMF caused the loss to Security Aviation, is satisfied is self-evident and requires no further discussion.

I find that the following transfers by IMF from its client trust account constituted an intentional exercise of dominion or control over the funds that so seriously

---

[119] As noted above, this Court rejected IMF's argument that the monies deposited were Kane's property.

[120] *Shields v. Cape Fox Corp.*, 42 P.3d 1083, 1088 n.12 (Alaska 2002).

[121] *Id.*

interfered with the rights of Security Aviation to control those funds that IMF may justly be

required to repay those funds:

| Date | Transferee | Amount |
|------|-----------|--------|
| September 21, 2006 | Robert Kane | $9,000.00 |
| September 25, 2006 | Robert Kane | $6,000.00 |
| October 3, 2006 | Robert Kane | $9,500.00 |
| October 3, 2006 | Robert Kane | $9,500.00 |
| January 12, 2007 | Robert Kane | $13,500.00 |
| January17, 2007 | IMF | $6,328.08 |
| February 8, 2007 | IMF | $10,530.84 |
| March 9, 2007 | IMF | $1,110.25 |
| April 10, 2007 | IMF | $4,295.25 |
|  | Total | $69,764.42 |

These are material facts, not genuinely in dispute, which the court will treat as established

in this case.[122]  These transfers constituted a conversion of Security Aviation's property.

Further, although the plaintiffs are not entitled to full summary judgment on their conversion

theory, as to *all* transfers made by IMF from its trust account after June 11, 2006, I will grant

partial summary judgment on their conversion claim, to the extent of the $69,764.42 in

transfers shown above.

        Additionally, the plaintiffs will be granted summary judgment on their claim

for unlawful post-petition transfers.  As explained above, the transfers IMF made from its

trust account after Security Aviation filed its bankruptcy petition were in violation of 11

---

[122] Fed. R. Civ. P. 56(g).

U.S.C. §§ 364, 327, and 362(a)(4).  Summary judgment will be entered on the plaintiffs'

ninth cause of action, in the sum of $35,764.42.

Fraudulent Transfers

        The plaintiffs' seventh cause of action seeks to recover $130,596.14 from IMF

on a fraudulent transfer theory under 11 U.S.C. § 548(a)(1)(B).[123]  This figure represents the

total of IMF's transfers from its trust account to pay for its legal fees, and includes the initial

three transfers from March 15, 2006, through May 10, 2006, which consumed the $50,000.00

retainer IMF received from Dorsey & Whitney.  As noted above, the $50,000.00 retainer will

not be considered in the context of the plaintiffs' summary judgment motion because their

amended complaint encompasses only the $150,000.00 retainer that IMF received from

Stockler.  Further, the plaintiffs' motion does *not* seek to recover any of the transfers from

IMF's trust account to Kane as a fraudulent transfer.[124]

        The transfers IMF made in payment of its fees, which arose *after* IMF's receipt

of the Security Aviation funds from Stockler but *before* the filing of Security Aviation's

chapter 11 petition, occurred from June 11, 2006, through December 14, 2006.  In all, there

---

[123] The plaintiffs do not seek summary judgment on their other fraudulent conveyance counts, found
in their fifth, sixth and eighth causes of action.  The fifth count seeks relief under 11 U.S.C. § 548(A)(1)(A),
the sixth under AS 34.40.010, and the eighth under § 548(a)(1)(B)(i)(IV).

[124] *See* Pls.' Mot. for Summ. J. (Docket No. 24), at 22-23; Pls.' Response to Def.'s Sur-Reply, filed
Jan. 10, 2011 (Docket No. 56), at 6.

were eight transfers, which totaled $80,909.05.[125]  These are the transfers which the court will evaluate here.

This court has already concluded that Security Aviation had an interest in the $150,000.00 IMF placed into its trust account.  Under § 548(a)(1)(B), a trustee may avoid any transfer of an interest in property of the debtor which was incurred by the debtor within two years of the filing of the petition, if the debtor:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.][126]

The term "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property; or an interest in property."[127]  "The Bankruptcy Code's definition of 'transfer' is *extremely* broad."[128]  Further, the plain language of § 101(54) "makes clear that the transfer need not be made directly by the debtor."[129]

---

[125] Spraker Decl. (Docket No. 26), Ex. B.

[126] 11 U.S.C. § 548(a)(1)(B).

[127] 11 U.S.C. § 101(54)(D).

[128] *Bernard v. Scheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir. 1996) (emphasis in original).

[129] *Fursman v. Ulrich (In re First Prot., Inc.)*, 440 B.R. 821, 828 (B.A.P. 9th Cir. 2010).

40

Looking first to the issue of insolvency, the plaintiffs' have presented credible evidence that Security Aviation was insolvent during the time the transfers to IMF were made.  Mr. Minkemann, the trustee's C.P.A., has established that Security Aviation was insolvent throughout 2006 on a balance sheet basis.[130]  IMF's evidence to the contrary, consisting of the Rader affidavit, is wholly conjectural and has no evidentiary value on this issue.  It fails to apply the balance sheet test for determining insolvency found in 11 U.S.C. § 101(32).  I find that Security Aviation was insolvent in 2006 when the transfers were made from IMF's trust account to pay for its legal fees.

Did Security Aviation receive reasonably equivalent value for the transfers made to IMF?

> Whether value has been given for a transfer depends on all the circumstances surrounding the transaction.  Thus, whether a release of rights under a contract or the surrender of a lease is made for value must depend upon whether a good bargain is being given up or a burdensome obligation is being discharged.  Whether the transfer is for "reasonably equivalent value" in every case is largely a question of fact, as to which considerable latitude must be given the trier of the facts.  In order to determine whether a fair economic exchange has occurred . . . the bankruptcy court must analyze all the circumstances surrounding the transfer in question. . . Because the ultimate issue is the impact of the transfer on the debtor's estate, the court must thus determine whether the debtor, as opposed to some other entity, received such value.

---

[130] *See* Second Minkemann Decl. (Docket No. 45) and Ex. D thereto, found at Docket No. 49 (Notice of Lodging Exs. to Second Minkemann Decl.).

> The analysis in such cases is similar to that of cases under the UFCA which held that a debtor did not receive reasonably equivalent value if its transfer was in exchange for a benefit to a third party.[131]

The determination of "reasonably equivalent value" does not contain a good faith component.[132]

Both sides take broad strokes on the issue of reasonably equivalent value. The plaintiffs argue that *all* transfers from IMF's trust account to pay fees incurred after the criminal trial were made in payment for the debt of another, Kane, and therefore such payments provided no value to Security Aviation. They say that these miscellaneous fees, including those incurred on Kane's behalf in conjunction with the Avery bankruptcy, provided no value to Security Aviation. IMF argues that its fees did give value to Security Aviation, because Avery and Kane had identical interests and that its fees provided benefit to both. I feel there is a grey area in between these two positions. On the one hand, the interests of Kane, Avery and Security Aviation appear to have been so intertwined, with respect to the criminal charges, that IMF's services in the criminal case arguably benefitted the interests of all three of these parties. Additionally, a review of IMF's fee itemization for services rendered post-trial indicate that it dealt with residual issues related to the criminal charges after the trial concluded. Further, a portion of IMF's post-trial fees were incurred

---

[131] 5 *Collier on Bankruptcy* ¶ 548.05[1][b] (Alan N. Resnick and Henry J. Sommer eds., 16th ed.) (footnotes omitted).

[132] *Id.*, ¶ 548.05[1][b].

42

on Avery's behalf and paid out of the retainer.  However, to the extent that fees were incurred exclusively for the benefit of Kane, particularly with regard to representing his interests in the Avery and Security Aviation bankruptcies, these fees would provide no value to Security Aviation.

These issues cannot be determined in the summary judgment context.  There are disputed issues of fact that must be resolved by the trier of facts, the jury.  Summary judgment for the plaintiffs on their seventh cause of action will therefore be denied.

Unjust Enrichment

The plaintiffs' motion seeks summary judgment on their third cause of action: unjust enrichment.  IMF filed a cross-motion for partial summary judgment on this count. To establish a claim for unjust enrichment, the plaintiffs must show:

> (1) a benefit conferred upon the defendant by the plaintiff;
>
> (2) appreciation by the defendant of such benefit; and
>
> (3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof.[133]

The retainer received by IMF conferred a potential benefit of $150,000.00 to the firm.  The plaintiffs only seek damages of $92,810.31, representing disbursements IMF made from its

---

[133] *Beluga Mining Co. v. State Dept. of Natural Res.,* 973 P.2d 570, 579 (Alaska 1999) (footnote omitted).

trust account after August 14, 2006.[134]  Of this sum, $47,500.00 was paid directly to Kane.

IMF clearly appreciated no benefit from the funds transferred to Kane, and the plaintiffs'

unjust enrichment claim fails as to these transfers.  That leaves at issue the sum of $45,310.31

which IMF charged for its attorney's fees and expenses.

The Alaska Supreme Court has found that the doctrine of unjust enrichment

is not, in itself, a theory of recovery, but is "a prerequisite for the enforcement of the doctrine

of restitution; that is, if there is no unjust enrichment, there is no basis for restitution."[135]

Further, restitution is not a cause of action but a remedy for various causes of action,

including quasi-contract, or contracts implied in law.[136]

> The courts are in accord in stressing that the most
> significant requirement for recovery in quasi-
> contract is that the enrichment of the defendant
> must be unjust; that is, the defendant must receive
> a true windfall or "something for nothing."
> Where a defendant has given fair consideration or
> value to a third party in exchange for the benefits
> conferred by the plaintiff, there is no windfall and
> no recovery will lie.[137]

---

[134] Am. Complaint (Docket No. 2), at 15.

[135] *Alaska Sales and Serv., Inc. v. Millet,* 735 P.2d 743, 746 (Alaska 1978).

[136] *Id.*

[137] *Id.* (citations omitted).

44

Here, IMF gave fair consideration or value to Robert Kane for the legal services it performed

on his behalf.  It did not receive a windfall.  Neither the trustee nor Security Aviation have

a valid claim for unjust enrichment.[138]  Partial summary judgment for IMF is warranted.


Conclusion

      The court finds that the following material facts, not genuinely in dispute, are

established in this case pursuant to Fed.  R. Civ. P. 56(g):

      1)     The S-550 Citation (N460-M) belonged to Security Aviation;

      2)     The source of the $1.45 million wired to Stockler's trust account on

March 22, 2006, was from the sale of the Citation;

      3)     IMF's $150,000.00 retainer came out of the $1.45 million that had been

wired to Stockler's trust account and was, therefore, attributable to the sale funds received

for the Citation;

      4)     Security Aviation had an interest in the $1.45 million wired to Stockler

and, consequently, IMF's $150,000.00 retainer.

      5)     The following transfers by IMF from its client trust account constituted

an intentional exercise of dominion or control over the funds that so seriously interfered with

the rights of Security Aviation to control those funds that IMF may justly be required to

repay those funds:

---

     [138] As with the discussion on the conversion claim, because the legal principles differ, this holding does not affect the question of whether Security Aviation received reasonably equivalent value in the context of the fraudulent conveyance claims.

| Date | Transferee | Amount |
|---|---|---|
| September 21, 2006 | Robert Kane | $9,000.00 |
| September 25, 2006 | Robert Kane | $6,000.00 |
| October 3, 2006 | Robert Kane | $9,500.00 |
| October 3, 2006 | Robert Kane | $9,500.00 |
| January 12, 2007 | Robert Kane | $13,500.00 |
| January17, 2007 | IMF | $6,328.08 |
| February 8, 2007 | IMF | $10,530.84 |
| March 9, 2007 | IMF | $1,110.25 |
| April 10, 2007 | IMF | $4,295.25 |
| | Total | $69,764.42 |

The plaintiffs' motion for summary judgment will be granted, in part, and denied, in part, as follows:

1)    Partial summary judgment is granted on the plaintiffs' fourth cause of action, conversion, in the sum of $69,764.42.

2)    Summary judgment is granted on the plaintiffs' ninth cause of action, for violation of the automatic stay and unlawful post-petition transfers, in the sum of $35,764.42.

3)    Summary judgment is denied as to the remainder of the counts encompassed in the plaintiffs' motion (breach of fiduciary duty, unjust enrichment, and constructive fraudulent conveyance).

The defendant's cross-motion for partial summary judgment on the issue of unjust enrichment will be granted and the plaintiffs' third cause of action will be dismissed,

with prejudice.  Further, summary judgment will be entered in favor of IMF on the plaintiffs'

count for breach of fiduciary duty, and the plaintiffs' second cause of action will be

dismissed, with prejudice.

An order will be entered consistent with this memorandum.

DATED:  March 31, 2011.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:        G. Spraker, Esq.
              M. Peterson, Esq.

03/31/11

47